IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IMPACT ENERGY RESOURCES, LLC, PEAK ROYALTY HOLDINGS, LLC, QUESTAR EXPLORATION AND PRODUCTION COMPANY, UINTAH COUNTY, CARBON COUNTY, DUCHESNE COUNTY<br><br>    Plaintiffs,<br><br>    vs.<br><br>KEN SALAZAR, in his official capacity as Secretary of the Department of the Interior, UNITED STATES DEPARTMENT OF THE INTERIOR; KENT HOFFMAN, in his official capacity as Deputy State Director for Minerals, Utah Bureau of Land Management of the Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT, Utah State Office,<br><br>    Defendants, and<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*<br><br>    Defendant-Intervernors. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case Nos.  2:09-CV-435 and<br>                  2:09-CV-440 |

The plaintiffs bring this suit claiming that the federal defendants' decision to withdraw leases from a Utah Bureau of Land Management Lease Sale after the competitive bidding process exceeded their statutory authority under the Mineral Leasing Act and the Federal Land Policy and Management Act. (Dkt, No. 62, Complaint).  Alternatively, the plaintiffs claim that the federal defendants acted arbitrarily and capriciously by withdrawing the parcels.

Impact Energy Resources, LLC, Peak Royalty Holdings, LLC, and Questar Exploration and Production Company (collectively, "the energy company plaintiffs") seek to protect their interest in nine of the leases for which they were recognized as the high responsible qualified bidders.  Uintah County, Carbon County, and Duchesne County (collectively, "the county plaintiffs") claim an economic interest in the leases on land parcels within their respective borders that were withdrawn.  The court consolidated the energy company plaintiffs' and the county plaintiffs' suits on July 20, 2009.

The defendants, Secretary of Interior Ken Salazar, the United States Department of the Interior, Deputy State Director Kent Hoffman, and the Utah State Office of the United States Bureau of Land Management (collectively, "the federal defendants"), oppose this suit. The court granted the Southern Utah Wilderness Alliance and other environmental and historic preservation advocacy groups (collectively, "SUWA") intervenor status; these parties also defend the Secretary's decision.

This case presents only questions of law.  As stipulated to by the parties, the court received one round of briefing and then heard oral argument on July 21, 2010.  Just one week before oral argument, the plaintiffs filed a motion for leave to supplement the record.  The court

denies this motion because the materials are outside the administrative record upon which the Secretary relied when making his decision and, therefore, are not relevant to the court's review. 5 U.S.C. § 706; Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993). As for the other legal issues presented to the court, after considering the parties' briefs and oral arguments, the administrative record, and the relevant law, the court enters the following Memorandum Decision and Order.

## BACKGROUND

The Mineral Leasing Act directs the Bureau of Land Management to conduct oil and gas lease sales "at least quarterly." 30 U.S.C. § 226(b)(1)(A). Consistent with that provision, on November 4, 2008, the BLM issued a "Notice of Competitive Lease Sale" ("Notice"). The Notice proposed to offer 241 parcels for lease during a competitive bidding process on December 19, 2008. AR 00681. The BLM prepared the Notice based on determinations by the BLM's Moab, Vernal, and Price field offices that including those parcels in the lease sale conformed with the corresponding Resource Management Plan for each field office and that the environmental consequence of leasing the parcels had been adequately considered in the Environmental Impact Statement for each plan in compliance with the National Environment Protection Act. See AR00015; AR00255; AR00457.

A Resource Management Plan is a blueprint explaining how the BLM will manage areas of public land over a period of time and includes at least twelve specific steps in order to be successfully developed.[1] One major step is preparing an Environmental Impact Statement,

---

[1] The steps required for the development of a Resource Management Plan include: (1) issuance of a Notice of Intent to Prepare the Resource Management Plan, (2) conduct scoping, (3) analysis of the management situation, (4) development of alternatives to address planning issues, (5) analysis of the effects of the alternatives, (6) selection of a preferred alternative, (7)

which is a comprehensive statement detailing the positive and negative environmental effects of a proposed agency action.

The Notice also described a formal process for members of the public to protest the inclusion of specific parcels in the lease sale pursuant to BLM regulations. AR 00686; see also 43 C.F.R. § 3120.1-3. The Notice explained that, for such parcels, the BLM would not issue a lease to the highest qualified bidder until the state director resolved the protests. AR 00686. Moreover, the Notice indicated that if the state director upheld a protest, the BLM would either impose additional protective stipulations or withdraw the parcel from the lease sale all together. Id. In the latter scenario, the BLM would refund the highest qualified bidder's rental, bonus bid, and administrative fees. Id.

The November 4 notice was the first time the National Park Service was notified that some of the parcels would be placed for sale. Typically, the BLM consults with the National Park Service prior to offering parcels in a lease sale. In this instance, however, the BLM neglected to notify the Park Service that it had added a number of parcels to the proposed lease sale. AR008403. So, following the notice's issuance, the two agencies conferred about the parcels of most interest to the National Park Service. Id. Due to the scheduled sale, the Park Service had a very short time frame to review the parcels listed for sale. AR005710.

After consulting with the Park Service and receiving a high volume of protests, including numerous protests to the leases at issue in this case, the BLM reduced the number of leases for

---

preparation of a draft Resource Management Plan/draft EIS, (8) provision of a ninety-day public comment period, (9) preparation of a proposed Resource Management Plan/final EIS based on comments received, (10) provision of a thirty-day public protest period upon publication of the proposed Resource Management Plan/final EIS, (11) approval of the Resource Management Plan through a record of decision once the protests have been resolved, (12) implementation, monitoring, and evaluation of plan decisions. See 43 C.F.R. 1610.4

sale to 132.  This decision was reflected in a document entitled "Decision to Lease."  AR00630.  Two days prior to the lease sale, SUWA sued the Assistant Secretary for Lands and Minerals Management, the Deputy State Director for Minerals of the BLM's Utah State Office ("Deputy State Director") and the BLM in the United States District Court for the District of Columbia ("the D.C. Action"), challenging the agency's decision to offer leases on 77 of the 132 parcels, including the leases at issue in this case.  The BLM moved forward with the sale but agreed to delay the issuance of leases for up to thirty days following the lease sale.  Southern Utah Wilderness Alliance v. Allred, No. 08-2187, 2009 WL 765882, at *1 (D.D.C. Jan. 17, 2009).

The sale commenced as planned on December 19, 2008.  During the competitive bidding process, 116 parcels received bids, and the BLM named high responsible qualified bidders for each of those parcels.  The agency named each of the energy company plaintiffs a high responsible qualified bidder.  A short time later, the BLM accepted and cashed the energy company plaintiffs' initial payments, bonus bids, and annual rentals for the first lease year of each lease sold.

On December 22, SUWA filed an application for a Temporary Restraining Order and Preliminary Injunction in the D.C. Action, seeking to prevent the BLM from issuing the oil and gas leases on the 77 contested parcels.  Shortly thereafter, the United States District Court for the District of Columbia issued a restraining order enjoining the BLM from issuing the contested leases.  Id., No. 08-2187,  2009 WL 765882, at *3.  The district court ordered that the restraining order would remain in effect until further notice from the court.  Id. at *5.

Following the issuance of the temporary restraining order, the newly inaugurated Obama

administration appointed a new Secretary of the Interior, Ken Salazar ("Secretary").  On February 4, 2009, the Secretary announced via media teleconference that he had directed the BLM to not issue leases to the high bidders on the disputed lease parcels.  The Secretary indicated that his decision was based both on the restraining order imposed in the D.C. Action and his view that the environmental review process for the lease sale was "not complete."  Ken Salazar, U.S. Sec'y of the Interior, Teleconference about Restoring Balance in Controversial Last-minute Oil and Gas Lease near Utah Nat'l Park (Feb. 4, 2009) (transcript available at http://www.doi.gov/news/podcasts/2009_ 02_04_podcast.cfm); AR08389.  Two days after the press conference, on February 6, the Secretary issued an intra-agency memorandum directing the Utah BLM State Director to withdraw the leases.  AR00597.  The Secretary explained that his decision was based on questions about the degree of coordination between the BLM and other federal agencies, the adequacy of the environmental review and analysis performed in connection with certain parcels and the underlying Resource Management Plans.  Id.  On February 12, 2009, Kent Hoffman, the Utah Deputy State Director for Minerals ("Deputy State Director"), sent a letter to each of the energy company plaintiffs, via registered mail, personally notifying the energy company plaintiffs of the parcel withdrawals and authorizing a refund of the energy company plaintiffs' initial payments, bonus bids, and annual rental fees.  See AR00605, AR00608, AR00609.

     In an attempt to exhaust administrative remedies prior to bringing the current action, the energy company plaintiffs and ten other companies appealed the agency's decision to withdraw the leases to the Interior Board of Land Appeals ("IBLA"), an administrative adjudicative body

within the U.S. Department of the Interior.  On April 9, 2010, the IBLA concluded that it lacked the authority to hear the appeal because the Secretary had approved the actions taken by the BLM.  See Robert L. Bayless Producer, 177 I.B.L.A. 83, 85 (2009) (citing 43 C.F.R. § 4.410(a)(3)).  Thereafter, on May 13, 2009, the plaintiffs filed this action against the Secretary, the Department of the Interior, the Deputy State Director, and the BLM.  On February 17, 2010, the court ordered that SUWA was entitled to intervene as defendants.

## DISCUSSION

An agency action may only be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)&(C).

In this case, the plaintiffs seek to overturn the Secretary of Interior's decision to withdraw nine parcels from the December 19 lease sale on three grounds.  First, the plaintiffs allege that the federal defendants exceeded their statutory authority under the Mineral Leasing Act by withdrawing the lease parcels after the lease sale.  Second, the plaintiffs allege that the federal defendants' decision to withdraw the lease parcels was a "defacto withdrawal" and thereby violated the Federal Land Policy Management Act.  Finally, the plaintiffs allege that the federal defendants' decision to withdraw the lease parcels was arbitrary and capricious.  Defendants, in return, argue that the plaintiffs are time barred from filing this suit and, alternatively, that the federal defendants were well within their statutory authority to withdraw the lease parcels.  The court will address each argument in turn.

## I. SECTION 226 OF THE MINERAL LEASING ACT IMPOSES A MANDATORY DUTY ON THE SECRETARY TO ISSUE LEASES AT THE COMPLETION OF A SUCCESSFUL COMPETITIVE BID PROCESS.

A. History of the Mineral Leasing Act

The Mineral Leasing Act authorizes the Secretary of the Interior to lease public lands to qualified individuals for oil and gas exploration and extraction. 30 U.S.C. §§ 181, 226.  As originally enacted, the Mineral Leasing Act only provided for leasing through competitive bidding:

> That all unappropriated deposits of oil or gas situated within the known geologic structure of a producing oil or gas field and the unentered lands containing the same, not subject to preferential lease, *may* be leased by the Secretary of the Interior to the highest responsible bidder by competitive bidding under general regulations to qualified applicants . . . .

Mineral Leasing Act of 1920, ch. 85, § 17, 41 Stat. 450 (1920) (codified as amended at 30 U.S.C. §§ 226(a)-(b) (2010)) (emphasis added).  Subsequently, the Act has undergone several changes since its enactment.  A 1960 amendment reorganized the original language into three distinct sections.  The first, § 17(a), bestows general authority on the Secretary to decide which lands to lease. Pub. L. 86-705, 41 Stat. 443 (1960) (codified as amended at 30 U.S.C. § 226(a) (2010)) ("All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits may be leased by the Secretary.")  The last two, §§ 17(b) and 17(c), respectively, describe the triggers and conditions for competitive and noncompetitive bidding. Pub. L. 86705, 41 Stat. 443 (1960) (codified as amended at 30 U.S.C. §§ 226(b)(1)(A), (c) (2010)).

The most significant changes to the Mineral Leasing Act relevant to this case are the

result of the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("FOOGLRA").  Pub. L. 100-203, tit. V, § 5101(a), 101 Stat. 1330 (1987) (codified as amended at 30 U.S.C. § 181, et seq.).  Both the plain language and the legislative history of that law considerably limit the Secretary's discretion.  FOOGLRA mandates that once the Secretary decides to lease a particular land parcel, "[t]he Secretary *shall* accept the highest bid from a responsible qualified bidder which is equal to or greater than the national minimum acceptable bid . . . ." and that "leases *shall* be issued" by the Secretary within sixty days following payment by the successful high bidder. 30 U.S.C. § 226 (b)(1)(A) (2010) (emphasis added).

FOOGLRA also reinforces a strict division between competitive and noncompetitive leasing.  In the past, the deciding factor was whether or not the land being leased was located within a known geological structure of a producing oil or gas field**.**  If the land was within a known geological structure, the lease had to be offered competitively.  If the land was not in such a structure, leases were issued through a noncompetitve leasing process, meaning a lease was not sold until an unsolicited party showed interest in the parcel.  The law now requires that all land parcels first be offered through competitive leasing, and if no bids over the national minimum are received from a responsible qualified bidder, then the land parcel may be offered through noncompetitive leasing.  See 30 U.S.C. § 226(c); 43 C.F.R. § 3110.1(b).  Noncompetitive lease offers may be made pre- and post-sale.

B.  Interpretation of the Mineral Leasing Act

Section 226(a) of the Mineral Leasing Act declares that "[a]ll lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits *may* be leased by

the Secretary." 30 U.S.C. § 226(a) (2010) (emphasis added). It is undisputed that, pursuant to this statute, prior to a lease sale the Secretary has discretion to decide which lands will be offered for lease. This case requires the court to decide at what point the Secretary loses that discretion. Focusing on the permissive "may" language of § 226(a), the defendants suggest the discretion conferred upon the Secretary is boundless or, at a minimum, extends to the point of actual issuance of the lease. See Defs. Br. at 11. When taken into consideration with §§ 226(b)(1)(A) and 226(c), it becomes clear that the permissive "may" language of § 226(a) is limited, and refers only to pre-sale decisions about whether or not to offer a parcel of land in a lease sale.

The defendants depend heavily on the pre-FOOGLRA decision Haley v. Seaton and similar case law to support their proposition. 281 F.2d 620, 624-25 (D.C. Cir. 1960). Haley is not on point. Haley was decided nearly thirty years prior to the enactment of FOOGLRA and involved very different circumstances. Haley dealt with a dispute over a noncompetitive lease and held that an offer for a noncompetitive oil and gas lease does not grant the offeror any vested right. As noted by the Haley court, because the dispute was over a pre-FOOGLRA noncompetitive lease, the Secretary had not yet decided that the "lands covered by [the lease] application [were] to be leased" at all. Id. at 625-26. That is, at the time, the procedure for noncompetitive leases was similar to the current procedure for a pre-sale noncompetitive offer to lease. In both cases a formal decision to lease a parcel has not been made prior to the noncompetitive offer. Instead, the offer itself is a suggestion that a particular parcel should be leased. Whereas in a competitive lease sale the agency has already decided that a parcel will be leased. Because the procedure for a pre-sale noncompetitive and competitive lease are so

different, the court does not find <u>Haley</u> persuasive.

Similarly, the IBLA's more recent <u>Richard D. Sawyer</u> decision does not persuade the court. 162 IBLA 339 (2004). Like <u>Haley</u>, <u>Sawyer</u> involved a noncompetitive lease. As discussed above, there is a fundamental difference between competitive leasing and noncompetitive leasing, including post-sale noncompetitive leasing. See <u>Ballard E. Spencer Trust, Inc. v. Morton</u>, 544 F.2d 1067, 1070 (10th Cir. 1976) (recognizing the distinction between noncompetitive and competitive leasing and that precedent regarding one form of leasing may be inapplicable to the other). Beyond the fact that competitive leasing is required before noncompetitive leasing is allowed, <u>see</u> 43 C.F.R. 3110.1(b), following FOOGLRA, the procedures for the two lease sales are still distinct. For instance, competitive lease sales determine lease priority by the amount bid, while noncompetitive lease sales determine priority by the order drawn. Competitive leasing can be likened to a homeowner listing their home for sale, and then agreeing to sell it to the highest bidder at an auction, so long as that bid was above a minimum price. In contrast, noncompetitive leasing is analogous to a random individual stumbling upon a "for-sale" sign in the seller's front yard and then making an offer on the house. In the competitive sale scenario, the seller has decided to sell the house, advertised the auction, and even defined the lowest price he is willing to accept. The seller has inherently less discretion to withdraw his offer when it comes to a competitive sale.

Finally, BLM regulations enhance the distinction between the two bidding procedures. The BLM's regulations permit noncompetitive offers to be withdrawn any time prior to issuance of the noncompetitive lease, while forbidding withdrawal of a competitive bid. See 43 C.F.R. §§

3110.6, 3120.5-3.

Despite these differences, the defendants urge a restrictive reading of § 226(b)(1)(A) to support their belief in the Secretary's broad discretion to withdraw lease parcels. The defendants argue that the "shall" language of § 226(b)(1)(A) refers solely to who must get a lease *if* the Secretary ultimately decides to issue a lease. The IBLA adopted this position in Sawyer, 162 I.B.L.A. 339 (2004), and the defendants argue that the court should defer to the agency's interpretation pursuant to the Chevron doctrine. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837, 842-43 (1984).

Although the IBLA has interpreted the statute to allow the secretary to withdraw lease parcels at any point prior to lease issuance, for reasons to be shown, that interpretation does not deserve Chevron deference.

In the the Tenth Circuit,

> [w]hen reviewing an agency's interpretation of a statute it administers, we first determine whether the statute is unambiguous. If the intent of Congress is clear then we must give effect to that intent. The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If, however, the statute is ambiguous or silent on the issue in question, we must determine whether the agency's determination is based on a permissible construction of the statute. If so, we will defer to the agency's interpretation.

Osborne v. Babbitt, 61 F.3d 810, 812 (10th Cir. 1995) (quoting Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir. 1995) (internal quotation marks and citations omitted)).

In this case there is no reason to defer to the agency's interpretation of § 226 because the statutory language is unambiguous. "It is a basic canon of statutory construction that use of the word 'shall' indicates a mandatory intent. " United States v. Myers, 106 F.3d 936, 941 (10th

Cir. 1997).  As explained in Forest Guardians v. Babbitt, "'[s]hall' mean's shall.  The Supreme Court and [the Tenth Circuit] have made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command."  174 F.3d 1178, 1187 (10th Cir. 1999).

The defendants fail to overcome the plain language of the statute, which states that "[t]he Secretary *shall* accept the highest bid from a responsible qualified bidder . . . ." 30 U.S.C. § 226(b)(1)(A) and "*shall* . . . issue "leases within 60 days following payment . . . ."  There is not a conditional "if" clause to temper the statute's mandate.  Instead, the language is clear that beyond dictating who will receive a lease, it also commands that for "[a]ll lands to be leased" the Secretary must accept the highest bid from a qualified bidder and issue the lease upon payment. Because the language of § 226(b)(1)(A) is unambiguous, the court "must give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 843.

The defendants argue that the determination of which lands are "to be leased" does not occur until the BLM "accepts" a lease offer by issuing the lease.  This interpretation is contrary to the language of the statute itself.  After curtailing its scope to "lands to be leased," the statute mandates that the highest qualified bid for such land must be accepted.  One can only conclude that Congress believed that a decision to lease parcels of land had been made by the time a competitive lease sale has ensued.  And, the facts of this case bear this out.  After an initial "Proposal to Lease," the agency evaluated voluminous feedback and then on December 12, 2008 made a "Decision to Lease."  The agency evaluated particular parcels and then included many of them in a final list of lands to be leased.  The court cannot conclude that after this point the

agency had not decided which lands were "to be leased." Therefore, the court concludes that under the plain language of § 226 of the Mineral Leasing Act, the Secretary did not have authority to withdraw any leases after the agency had named the high bidders.

The plaintiffs also argue that the Secretary exceeded his statutory authority under the Federal Land Policy and Management Act and, alternatively, that the decision was arbitrary and capricious under the Administrative Procedure Act. Having concluded that the Secretary's decision ran afoul of the Mineral Leasing Act, it is unnecessary for the court to address those claims. However, the court still must address the defendants' argument that despite the merits of the plaintiffs' claims, they are time barred.

## II. THE PLAINTIFFS FAILED TO FILE THEIR LAWSUIT WITHIN THE MINERAL LEASING ACT'S NINETY-DAY STATUTE OF LIMITATIONS.

Sovereign immunity shields federal agencies from suit. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). However, Congress has waived its immunity for a wide range of suits, including those seeking relief other than money damages. See, e.g., the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and the Tucker Act, 28 U.S.C. § 1491. In this case, the plaintiffs assert their claim based on the waiver found in § 702 of the Administrative Procedures Act, which provides in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

For claims alleging violation of the Mineral Leasing Act, the waiver found in 5 U.S.C. § 702, is conditioned by the statute of limitations found in 30 U.S.C. § 226-2. Section 226-2 provides that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2 (2010); see also 43 C.F.R § 3000.5.

Because claims contesting a decision involving oil and gas leases the involve a waiver of sovereign immunity, the applicable limitation on claims must be strictly construed. See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990); 51 Am. Jur. 2d Limitation of Actions § 55 (statutes of limitations "must be strictly construed in favor of the government"). However, the court must be careful not to "narrow the waiver that Congress intended," United States v. Kubrick, 444 U.S. 111, 118 (1979), or construe the waiver "unduly restrictively." See Block v. North Dakota, 461 U.S. 273, 287 (1983). Unlike a general statute of limitation that begins with the accrual of a claim, 51 Am. Jur. 2d Limitation of Actions § 147, the Mineral Leasing Act statute of limitation clearly indicates the event that triggers the time limit–the final decision of the Secretary.

The plaintiffs assert that letters from the Deputy State Director to the energy company plaintiffs on February 12, 2009, precisely ninety days before the plaintiffs filed their complaint, was the Secretary's final decision. The federal defendants claim the press release announcing the Secretary's decision, issued on February 4, 2009, was the Secretary's final decision. The

court disagrees with both parties and concludes that the February 6, 2009 intra-agency memo was the Secretary's final decision.

In other areas of the law, a final decision is one that is conclusive and "ends the litigation on the merits." See Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., 130 S.Ct. 1758, 1778 (2010). Similarly in administrative law, a decision that is subject to appeal to the IBLA is not considered final. See 43 C.F.R. § 4.21(d). In contrast, "a decision [that] has been approved by the Secretary" is not appealable within the agency and is considered final for purposes of judicial review. 43 C.F.R. §§ 4.410(a), (a)(3).

In this case, the Secretary completed his decision making process at the very latest on February 6 when he sent the intra-agency memo. This event, then, marks the time at which the Secretary's decision was final. The internal memorandum explained the Secretary's decision and explicitly directed the BLM to withdraw the lease parcels; it did not grant the BLM any discretion to revisit the Secretary's decision. Any subsequent events, such as personally notifying the high bidders, were procedural tasks carrying out that decision. These acts in no way reopened the Secretary's decision-making process.

Still, the plaintiffs argue that equitable tolling is required or that the statute of limitations should not begin to run until they received personal notice pursuant to the Administrative Procedure Act's notice statute, which requires that "[p]rompt notice . . . be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e).

"Equitable tolling is reserved for those rare occasions where circumstances beyond a

person's control result in non-compliance with a filing deadline despite diligent efforts." See United States v. Mumpower, 365 Fed. Appx. 968, 970 (10th Cir. 2010). In this case, the plaintiffs' arguments are unavailing. First, the statute of limitations, unlike other statute of limitations or notice of claim statutes does not reference, let alone require, notice. Compare 30 U.S.C.§ 226-2 with 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal Agency within two years after such claim accrues or unless action is begun six months after the date of mailing . . . of notice of final denial of the claim by the agency to which it was presented."). Second, the Administrative Procedure Act notice requirement does not supersede the Mineral Leasing Act statute of limitations. Instead, the notice statute only provides grounds for tolling and then only when notice is given so late that despite counsel's diligent efforts, they cannot reasonably comply with the statute of limitations. That is not the case here.

The plaintiffs' counsel had ample notice of the Secretary's decision and sufficient time to comply with the statute of limitation. The plaintiffs received notice through a widely distributed press release, a notice filed in the D.C. Action, and individual letters. Even the latest notice was only six days after the Secretary's decision, and did not significantly affect the plaintiffs time to respond. Moreover, the plaintiffs were clearly aware of the possibility that the February 6 intra-agency memo could be the Secretary's final decision. In the energy company plaintiffs' appeal to the IBLA, the energy company plaintiffs asked the IBLA to clarify which of the two actions of the Secretary was his final decision for the purpose of calculating the statute of limitations. Robert L. Bayless, 177 I.B.L.A. 83, 84 (2009). Although the IBLA did not answer

the question because it lacked jurisdiction to hear the appeal, the energy company plaintiffs were on notice of when the limitation period might begin to run.  Accordingly, the court concludes that the plaintiffs' suit is untimely.

## CONCLUSION

The plain language of the Mineral Leasing Act mandates the Secretary of Interior to accept bids and issue leases as part of the competitive leasing process for oil and gas leases.  This mandate truncates the discretion the Secretary generally possesses to determine whether or not to issue a lease.  In this case, the Secretary exceeded his statutory authority by withdrawing leases after determining which parcels were to be leased and after holding a competitive lease sale during which the BLM named the plaintiffs high responsible bidders.  Ultimately though, the plaintiffs' claims are time barred.  Faced with a strict statute of limitations, the plaintiffs failed to file their suit within ninety days of the Secretary's final decision.  Under 30 U.S.C. § 226-2, this is too late.

Accordingly, judgment is entered in favor of the defendants.

DATED this 31st day of August, 2010.

_____
Dee Benson
United States District Judge